HARVEL'S, INC., v. FRANK L. EGGLESTON.

(Filed 2 November, 1966.)

**1. Damages § 12; Contracts § 26—**

Ordinarily, a party's financial ability to respond in damages or pay an alleged debt is totally irrelevant to the issue of whether such party entered into the alleged contract for the purchase of goods, and the admission of evidence of such financial responsibility ordinarily will be held prejudicial except in cases warranting an award of punitive damages.

**2. Same; Sales § 10—**

Where plaintiff sues on a contract for the purchase and delivery of goods in a large sum, and defendant denies the contract, plaintiff is entitled to testify that defendant represented to him that he had a large monthly income and produced his bankbook in substantiation of the statement, since such testimony tends to show that defendant thus induced plaintiff to extend him credit and is a relevant circumstance in the negotiation of the contract as alleged by plaintiff.

**3. Same—**

Where plaintiff sues on an alleged contract of defendant to purchase furnishings for a house which he was providing for the benefit of his daughter, and that defendant constituted his daughter his agent for the selection of the furnishings, defendant's denial that he had ever told his daughter he was giving her a home and furnishings renders competent testimony by the daughter that defendant had told her he intended to remarry and that he and his prospective bride would occupy a certain bedroom in the house, since such testimony tends to establish the circumstances surrounding the negotiation of the alleged agreement.

**4. Appeal and Error § 41—**

Exception to the admission of testimony is waived when testimony of the same import is thereafter admitted without objection.

**5. Evidence § 58—**

Where defendant denies many of the conversations asserted by plaintiff in the negotiations which plaintiff asserts resulted in the contract in suit, plaintiff is entitled to ask defendant on cross-examination in regard to an incident occurring at the time of one of the conversations in order to refresh defendant's memory.

**6. Trial § 40—**

The form and sufficiency of the issues is largely in the discretion of the trial court, and when the issues submitted bring into focus each defense alleged by defendant and allow him to present his contentions fully, and embrace all of the essential questions in controversy, defendant's objection that the court submitted improper issues cannot be sustained.

**7. Principal and Agent § 4—**

When plaintiff introduces evidence tending to establish the agency and that the agent was authorized to execute the contract in suit in behalf of the principal, the burden devolves upon the principal to show that he thereafter terminated the agency or limited the agent's authority.

APPEAL by defendant from *Gwyn, J.,* March 21, 1966 Civil Session of FORSYTH.

Action to recover $9,125.05 with interest from June 5, 1965, the balance allegedly due on an account for goods sold and delivered upon defendant's order.

Plaintiff's evidence tends to show the following facts: In February 1965, defendant came to plaintiff corporation's retail furniture store and informed Claude C. Harvel, its president and manager, that he had determined to give his daughter, Mrs. Frances Carter, a house in Greensboro and to furnish it completely. Mr. Harvel agreed with defendant that plaintiff would provide an interior decorator to assist Mrs. Carter in selecting furnishings of her choice, and—if all purchases were made from plaintiff—to allow defendant a 25% discount from the retail price on the total bill. Defendant told Harvel that he had an income of $32,500.00 a month and was financially able to do "whatever he needed to do for Mrs. Carter." In corroboration, he exhibited to Harvel a bankbook showing monthly deposits. In his presence, defendant called Mrs. Carter and told her of the arrangements which he had just made with plaintiff. Defendant told Harvel to keep the bill "as low as he could," and Harvel promised defendant an estimate in a few days.

On the next day, defendant returned to the store with a lady named Lucy and requested Mr. Harvel to purchase two English bicycles for them. (This purchase was made and defendant paid for the bicycles.) At that time, Harvel told defendant that a "quick analysis" showed it would cost between $15,000.00 and $16,000.00 to furnish Mrs. Carter's house. Defendant told him to proceed but to hold the cost down as low as possible. He added, however, that he wanted the house to be a showplace and one of the finest homes in Greensboro. Several days later, defendant returned to inform plaintiff that he had instructed his daughter to furnish a basement playroom, two outside porches, and a patio—areas which had not been included in the estimate. Harvel informed defendant that the cost of furnishing these additional areas would be over and above the estimate. Defendant said that he understood this and that Harvel should go ahead, that he would pay whatever it cost—but to keep the cost as low as possible.

As a result of this conversation, plaintiff furnished, upon Mrs. Carter's orders, merchandise in the total amount of $26,008.37. This sum was reduced by credits to $25,589.59, as shown by the itemized bill which plaintiff rendered defendant. Defendant expressed satisfaction with the furniture and plaintiff's charges for it. On April 5, 1965, defendant gave plaintiff his check for $15,589.59 and the following statement (plaintiff's Exhibit 41), which he wrote out in

Harvel's presence, "Bal. due $10,000.00 to be paid on or before June 5, 1965." At that time, all the furnishings purchased had not been delivered, and defendant instructed plaintiff to complete delivery as quickly as possible.

Thereafter plaintiff heard nothing further from defendant until the latter part of May 1965, when he came to the store with his attorney and told Harvel that he had had a disagreement with his daughter; that he was not going to allow her to remain in the home he had provided for her; and that he had no further need for the furnishings. He requested plaintiff's assistance in disposing of the merchandise already delivered, instructed him to make no more deliveries, and asked him to cancel all orders for undelivered merchandise and to credit his account with those charges. The undelivered merchandise represented special orders which plaintiff declined to cancel. Later, however, plaintiff was able to cancel one order and to credit defendant with $199.95. Upon the instructions of defendant's attorney, plaintiff sold for $675.00 a pool table which Mrs. Carter had purchased at $1,174.20. The sum of these two items, $874.95, reduced the balance to $9,125.05 for which it sues.

Mrs. Carter testified as a witness for plaintiff, against her father. She stated, *inter alia*, that during the time plaintiff was furnishing the house, defendant frequently urged her to hurry the job, saying, "I want to come in with you." Early in April, after an argument with his son-in-law, defendant went to Florida, where his daughter was unable to reach him. She moved out of the house after "getting a notice from a justice of the peace."

Defendant alleged that he had authorized no purchases in excess of $15,000.00; that he had paid plaintiff $15,589.59; and that he owed it nothing more. His testimony tended to show:

About March 31, 1965, as an investment, he purchased a house in Greensboro in his own name and made a contract with plaintiff to furnish it *for him* at a cost not to exceed $10,000.00. This sum included the services of an interior decorator as well as the cost of curtains and draperies, and plaintiff agreed to sell defendant all items at cost plus 15%. Defendant told his daughter that Mr. Harvel would know the kind and price of the furniture which she should get. He "left it all up to Mr. Harvel and not to Frances," and told them both that he was not going to spend over $10,000.00 to furnish the house. He never said that he wanted a showplace; he did not give his daughter the furniture in question, nor did he tell her he was giving her the house. He never had an income of $32,500.00 a month and made no such statement to Mr. Harvel; he was not separated from his second wife.

After defendant made the contract with plaintiff, he went to

Pennsylvania on business. When he returned, he found that Harvel had "overloaded Frances with furniture." She had purchased two television sets and a pool table, and the house was crowded with furniture which it did not need. As a result of his protest, his daughter's husband "blew up" and "went to cursing," and he told defendant that if he never again put his foot back in the house he would be happy. Although Harvel had exceeded his authorization by more than 50%, defendant paid plaintiff $15,589.59, and gave it another check in the amount of $2,600.00, payable to the interior decorator. He paid these sums because he felt "like it was that much furniture in the house. . . ." but he still wanted plaintiff to take back the furniture which Mrs. Carter did not need to keep house and to settle with him on the basis of cost, plus 15%, according to their original agreement. When Mr. Harvel attempted to get him to sign a note for the $10,000.00 balance he claimed defendant owed, he refused. Plaintiff's Exhibit 41 was not intended as an acknowledgment of indebtedness; on the contrary, it was merely defendant's notation that plaintiff claimed a balance due of $10,000.00, and that it had requested payment by June 5th. Defendant either left this paper on Mr. Harvel's desk by mistake or dropped it before leaving.

Plaintiff and defendant each tendered issues, but the court formulated its own, which the jury answered as follows:

"1. Did the defendant, Frank Eggleston, authorize and empower Frances Eggleston Carter to act as his agent and did she act within the scope of her authority in selecting and purchasing the furniture, furnishings, wares, merchandise and services, as alleged in the complaint?

ANSWER: Yes.

"2. Did the plaintiff, Harvel's, Incorporated, enter into an agreement with the defendant, Frank Eggleston, under which the defendant purchased, by and through his agent, Mrs. Frances Eggleston Carter, goods, wares, household furnishings, services and accessories, as alleged in the complaint?

ANSWER: Yes.

"3. Did the defendant, Frank Eggleston, limit the authority of his agent, Mrs. Frances Eggleston Carter, and the plaintiff, Harvel's Incorporated, to the sum of $15,000.00 in price for the purchase and deliveries of the goods, wares, merchandise, furniture, furnishings and services, as alleged in the answer?

ANSWER: No.

"4. What was the contract price of the goods, wares, merchandise, furnishings, furniture, accessories and services actually delivered?

ANSWER: $21,477.62.

"5. What was the contract price of the goods, wares, merchandise, furniture, furnishings, services and accessories purchased by the defendant but which were not delivered?

ANSWER: $4,275.72.

"6. Did the defendant wrongfully refuse to accept delivery of the goods, wares, merchandise, furniture and furnishings purchased in excess of $15,000.00, as alleged in the complaint?

ANSWER: Yes.

"7. Did the defendant, Frank Eggleston, authorize the sale of the pool table for the sum of $675.00 and the crediting of his account with that amount?

ANSWER: Yes.

"8. What credits, including any payments of money, are the defendant entitled to have applied in reduction of his account?

ANSWER: $16,464.54.

"9. What amount, if anything, is the plaintiff entitled to recover of the defendant?

ANSWER: $9,288.80."

The court entered judgment upon the verdict and defendant appealed.

*Booe, Mitchell and Goodson by William S. Mitchell for plaintiff appellee.*

*Block, Meyland & Lloyd by A. L. Meyland and Henry H. Isaacson for defendant appellant.*

SHARP, J. The testimony of Mr. Harvel, plaintiff's president and manager, that defendant told him he had a monthly income of $32,500.00, and was well able to pay for the furniture he had ordered, was admitted over defendant's objection and exception. He assigns its admission as error, contending that Harvel's testimony, together with the cross-examination which resulted from defendant's contradiction of it, presented him to the jury as a rich man, able to indulge an extravagant daughter, and that such testimony was fatal to his defense.

Certainly, standing alone, evidence that an individual is financially able to make a specified purchase is not evidence tending to show that he made it. Ordinarily, a party's financial ability to respond in damages, or to pay an alleged debt, is totally irrelevant to the issue of liability; and the admission of evidence tending to establish such ability is held to be prejudicial, except in cases warranting an award of punitive damages. See *Electric Company v. Dennis*, 259 N.C. 354, 130 S.E. 2d 547; *Edwards v. Finance Com-*

*pany*, 196 N.C. 462, 146 S.E. 89; *Shepherd v. Lumber Co.*, 166 N.C. 130, 81 S.E. 1064. Here, however, the testimony that defendant told plaintiff he had a specified monthly income was not offered to establish defendant's financial worth. Defendant's production of his bankbook and representation that he had a monthly income of $32,500.00 was intended to induce plaintiff to extend him credit. The incident was an integral part of the negotiations which culminated in the contract in suit. Ordinary business prudence would have required plaintiff to ascertain defendant's financial condition before undertaking his commission to furnish Mrs. Carter's house according to her taste, and to make it a showplace. When defendant denied the contract upon which plaintiff sues, plaintiff was entitled to show the relevant circumstances and negotiations which resulted in the alleged agreement. Other evidence pertaining to defendant's financial worth was elicited without objection, and defendant testified that his annual income was less than $20,000.00.

Defendant also assigns as error the refusal of the court to strike testimony by Mrs. Carter that defendant, in April 1965, intended to marry Lucy and that he had told his daughter they would occupy a certain bedroom in the new house. Counsel's basis for the motion to strike the first statement was, "How does she know what he intended?" — a question directed to the court. Mrs. Carter answered by saying that defendant had told her. The basis of the motion to strike the second statement was that it was not responsive to the question. Notwithstanding, defendant's denial that he ever told Mrs. Carter he was giving her a home and furnishing it for her made this evidence relevant to the inquiry. Furthermore, in view of the other testimony relating to Lucy and defendant's separation from his second wife which was admitted without objection, it cannot reasonably be asserted that these two items prejudiced defendant's defense. Mrs. Carter testified, without objection, that defendant was separated from his second wife, who had not been friendly with her; that he was going to marry Lucy, who, along with defendant, had visited her for a week during the first of April when they had all been happy in the new house; and that his purpose in buying Mrs. Carter a house was to enable him and Lucy to visit her and all his grandchildren together. Mrs. Carter had seven children. Six by a former marriage were in the custody of her first husband. She also testified, without objection, that it was after defendant had given Lucy a "Stingray" (Corvette automobile) that he gave her permission to buy the pool table for her husband. Defendant did object, however, to questions put to him on cross-examination which suggested that Lucy had expressed a desire for a Corvette when she saw one in front of plaintiff's store when she accompanied defend-

ant on one of his trips there while plaintiff was furnishing the house. Defendant had denied many of the conversations which Mr. Harvel testified he had had with him, and he was indefinite as to the number of times he went to plaintiff's store. The questions with reference to the Corvette were an attempt by plaintiff's counsel to refresh defendant's recollection as to one of the visits he had made to plaintiff's store. The court was careful to instruct the jury that this evidence related "only to the circumstances under which the defendant is alleged to have contacted and dealt with Mr. Harvel with relation to the matters set forth in the complaint." The evidence was competent for that purpose.

The second question which defendant discusses in his brief is whether the court submitted improper issues to the jury. Defendant excepted to the court's issues, but he did not include in his case on appeal those which he had proposed. Neither does he, in his brief, suggest the proper issues. The ultimate question posed in this action is, "In what amount, if any, is the defendant indebted to the plaintiff?" Obviously, however, the disputed facts upon which plaintiff's right to recover depends could not be resolved upon that one issue. *Yates v. Body Co.*, 258 N.C. 16, 128 S.E. 2d 11. The detailed issues which the court submitted brought into focus each defense which defendant had alleged and allowed him to present his contentions fully. The court is not required to adopt any particular form of issues; it is only required that those which are submitted embrace all the essential questions in controversy. *O'Briant v. O'Briant*, 239 N.C. 101, 79 S.E. 2d 252. Defendant's assignment of error relating to the issues is not sustained.

The third question presented—did his Honor err in charging the jury that the burden of proof upon the third issue was upon defendant?—is answered No. It is often said that it behooves one who deals with a purported agent to ascertain correctly two things: (1) that he actually is an agent, and (2) the extent of his authority. *Edgewood Knoll Apartments v. Braswell*, 239 N.C. 560, 80 S.E. 2d 653. Wherever the existence of the relationship of principal and agent is denied, the burden of proof is upon the party asserting the existence of the relationship. 3 Am. Jur. 2d, Agency § 348 (1962). Once the existence of the agency and the extent of the authority is established, however, the burden devolves upon the principal to show that he thereafter terminated the agency or limited the authority —and this is true whether the agency be general or special. *Research Corporation v. Hardware Co.*, 263 N.C. 718, 140 S.E. 2d 416; *Bank v. Howell*, 200 N.C. 637, 158 S.E. 203. See 3 Am. Jur. 2d, Agency § 349 (1962). Here, the jury's answers to the first two issues established Mrs. Carter's authority to purchase from plaintiff such fur-

niture as she should select for her house. The burden then passed to defendant to show that he thereafter limited her authority and notified plaintiff of the limitation.

> "In an action against a principal for the purchase price of goods sold and delivered to his agent, the seller has the burden of proving the authority of the agent to bind the principal; but after such authority has been sufficiently proved or admitted, the principal has the burden of proving that the authority had been limited or revoked and that the limitation or revocation had been brought to the attention of the seller." 3 C.J.S., Agency § 317(2) (1936), p. 261.

It is noted, however, that the judge placed the burden of proof upon the sixth issue on plaintiff. We perceive no material difference between these two issues, both of which were answered against defendant.

Our consideration of this case was rendered more laborious by appellant's failure to comply with Rule 28 of the Rules of Practice in the Supreme Court of North Carolina. His brief contains no reference to the exceptions upon which the assignments of error discussed therein were based, and no reference to the printed pages of the transcript on which those exceptions appear. Notwithstanding, we have considered each assignment of error brought forward and discussed in defendant's brief. Each is overruled.

In the trial, we find

No error.