RAYMOND STRICKLAND v. MARLON JACKSON AND CARLTON JACKSON

No. 7411SC641

(Filed 20 November 1974)

1. **Damages § 14— transfer of property — competency on question of punitive damages**

    In an action to recover for personal injuries received by plaintiff when he was assaulted by defendants with a shotgun, evidence that defendants had transferred 100 acres of land to one defendant's wife after the action was commenced was competent upon the question of defendants' ability to respond in punitive damages.

2. **Assault and Battery § 3— civil assault — evidence of reputation**

    While the dispositions of the parties in a civil assault case may be shown by evidence of reputation when there is a plea of self-defense or an issue as to who committed the first act of aggression, testimony in such a case that defendants' general character and reputation were "good, excellent" did not show the disposition of defendants toward peacefulness and violence and was properly excluded by the trial court.

3. **Evidence § 48— qualification as expert — waiver of objection**

    In a civil assault case, defendants waived objection to the qualifications of a police officer to give his opinion concerning the distance at which a shotgun could inflict injuries of the type suffered by plaintiff by failing to object specifically to the qualifications of the witness.

APPEAL by defendants from *Webb, Judge,* 25 February 1974 Session of Superior Court held in HARNETT County. Argued in the Court of Appeals 25 September 1974.

Plaintiff seeks to recover damages for personal injuries suffered as a result of an assault with a shotgun upon him by the defendants. According to plaintiff's evidence, at the time of the assault, plaintiff was in the logging business and was conducting logging operations on property adjoining the defendants' property. Plaintiff asked the defendants if he could use their land to load timber, and the defendants consented to his proposition. Plaintiff used the defendants' property for five or six weeks until he was told by the defendants "to get off their land the next morning because they were having confusion between the family due to the fact that they were letting me use their land." Plaintiff removed his logging equipment the next morning.

---

---

On 8 October 1970 plaintiff was logging on Jarvis Tew's land, which adjoined defendants' land, with his uncle and an employee, Troy Ferguson, when defendant Marlon Jackson emerged from the woods. Plaintiff got down from his Timber Jack and walked toward the defendant. Plaintiff testified that as he approached the defendant Marlon Jackson, he could see that the defendant was carrying a bolt action .22 caliber rifle. Plaintiff testified that the defendant told him that he was going to kill him. Plaintiff stated that the defendant walked to within a foot of him; plaintiff then pushed the gun barrel away with his right hand and hit the defendant with his left hand. Defendant fell down and, after getting up, asked the plaintiff for his gun. Plaintiff refused to give it to him. Plaintiff testified that defendant Marlon Jackson then shouted: "Shoot the hell out of him Carlton," whereupon defendant Carlton Jackson sprang up from behind plaintiff's pickup truck a short distance away and shot the plaintiff in the neck and shoulder with a 12-gauge shotgun. Troy Ferguson, the plaintiff's employee, testified that he did not witness the shooting, but, on hearing a gunshot, he rushed to the place where the plaintiff had been logging and found the plaintiff squatting on his knees. The defendants were standing beside the pickup truck. Each held a gun.

The plaintiff's physician, Dr. James Urbaniak, a specialist in orthopedic surgery at Duke University Medical Center, testified that the plaintiff's right upper extremity from the shoulder to the hand had been paralyzed as a result of the shooting. Plaintiff now has the ability to bend his elbow, but Dr. Urbaniak stated that this is the maximum improvement of which the plaintiff is capable. Dr. Urbaniak testified that the plaintiff will have to have either his arm or his hand amputated and a prosthesis attached. The total cost of an operation, a prosthesis, and hospitalization is anticipated to be approximately $10,000.00. Plaintiff testified that he has not worked since the date of the assault.

Defendant Marlon Jackson testified that on 8 October 1970 he went to the site of the plaintiff's logging operations to see if the plaintiff was using the Jackson property. The defendant stated that he carried no gun but that his brother, Carlton, who was about one quarter mile away at a hog pen, did have a shotgun. When the defendant got to the site of the plaintiff's operations, the plaintiff picked up a stick and approached the defendant. The defendant testified that he had a chew of tobacco

in his mouth and turned his head to avoid spitting into the wind. The plaintiff struck the defendant with the stick, cutting his forehead. The defendant Marlon Jackson does not remember anything further until he regained his senses while being dragged back to the hog pen by his brother, Carlton Jackson.

Defendant Carlton Jackson testified that after his brother failed to return from the site of the plaintiff's logging operations, he set out after him. Defendant Carlton Jackson found his brother lying at the feet of the plaintiff. When the plaintiff threatened to kill defendant Carlton Jackson and began advancing upon him, the defendant shot the plaintiff.

Two witnesses testified that they had seen a cut on the defendant Marlon Jackson's forehead. Two other witnesses for the defense gave testimony to the effect that the plaintiff might have been cutting timber on the defendants' property. Dr. John Nance, the defendants' physician, testified that he had treated the defendant Marlon Jackson for a lacerated forehead.

The jury reached a verdict favorable to the plaintiff and awarded the plaintiff $75,000.00 compensatory damages and $5,000.00 punitive damages. The defendants appealed.

*Chambliss, Paderick, Warrick & Johnson, P.A., by Joseph B. Chambliss, for the defendant-appellants.*

*Bryan, Jones, Johnson, Hunter & Greene, by C. M. Hunter, for the plaintiff-appellee.*

BROCK, Chief Judge.

[1] Defendants contend that the trial court committed error when it permitted testimony concerning the transfer of real property by the defendants subsequent to the assault. The plaintiff's counsel first inquired into defendants' ownership of land on cross-examination upon the question of the defendants' financial ability to respond in punitive damages. Testimony elicited by the plaintiff's counsel indicated that the defendants' property, consisting of approximately 100 acres, was transferred to defendant Carlton Jackson's wife in October, 1971, subsequent to the commencement of this action by the plaintiff. Defendants concede that evidence of the financial condition of a defendant is admissible in an action where punitive damages may be awarded, but argue that the evidence in this case went beyond that rule to the defendants' prejudice. We disagree.

It is well settled in North Carolina that "[o]rdinarily, a party's financial ability to respond in damages, or to pay an alleged debt, is totally irrelevant to the issue of liability; and the admission of evidence tending to establish such ability is held to be prejudicial, except in cases warranting an award of punitive damages." *Harvel's, Inc. v. Eggleston,* 268 N.C. 388, 392, 150 S.E. 2d 786. Such evidence is admissible "on the theory that the allowance of a given sum would be a greater punishment to a man of small means than to one possessing larger wealth." 22 Am. Jur. 2d, *Damages,* § 322 (1965) (footnote omitted). The evidence elicited by the plaintiff's counsel was competent upon the question of ability to respond in punitive damages. This assignment of error is overruled.

[2] Defendants contend that the trial court committed error when it failed to permit witnesses for the defense to testify as to the character and reputation of the defendants. It is well settled that "[e]vidence of the good or bad character of either party to a civil action is generally inadmissible. Such evidence is regarded as being too remote to be of substantial value, as tending to confuse the issues and unduly protract the trial, and (most important of all) as offering a temptation to the jury to reward a good life or punish a bad man instead of deciding the issues before them." 1 Stansbury, North Carolina Evidence, § 103 (Brandis Revision, 1973) (footnotes omitted). Defendants argue that exceptions to the general rule would permit the introduction of character evidence in this case. Although the exceptions do not include cases of civil assault and battery, the exceptions do "suggest a general practice of admitting character evidence in civil cases 'where a moral intent is marked and prominent in the nature of the issue,' . . . " 1 Stansbury, North Carolina Evidence, § 103 (Brandis Revision, 1973) (footnotes omitted).

The introduction of character evidence in criminal actions is an historical, special dispensation to criminal defendants whose life or liberty is at stake. A majority of courts have refused to allow character evidence in civil actions due to time consumption and detraction from the issues. But a growing minority of jurisdictions "has been impressed with the serious consequences to the party's standing, reputation, and relationships which such a charge, even in a civil action, may bring in its train, and has followed the criminal analogy, by permitting the party to introduce evidence of his good reputation for

the trait involved in the charge." McCormick on Evidence, § 192 (1972) (footnotes omitted). We note, however, that civil actions for assault are treated differently. *See* 154 A.L.R. 121; 1 A.L.R. 3d 571. A succinct discussion is found in McCormick on Evidence:

> "When the issue is merely whether the defendant committed the act charged, then the courts would presumably admit or exclude defendant's evidence of good reputation according to their alignment with the majority or minority view on the general question, . . . But when the defendant pleads self-defence, he may show the plaintiff's reputation for turbulence if he proves it was known to him, on the issue of reasonable apprehension. Similarly, when on a plea of self-defence or otherwise there is an issue as to who committed the first act of aggression, most courts (regardless of their alignment on the general question) seem to admit evidence of the good or bad reputation of both plaintiff and defendant for peacefulness as shedding light on their probable acts. This cannot be justified, as is sometimes attempted, on the ground that character is here 'in issue' — the issue is clearly one of conduct—but probably there is in these cases a special need even beyond that in most cases of charges of crime in civil actions, for knowing the dispositions of the parties." McCormick on Evidence, § 192 (1972) (footnotes omitted).

Defendants rely on the case of *Hess v. Marinari*, 81 W. Va. 500, 94 S.E. 968 (1918), as supporting the proposition that character evidence is admissible in civil actions for assault. In *Hess* there was an assault and a claim for punitive damages. The court noted that such a claim requires a finding of criminal intent and ruled that the defendant was entitled, as in a criminal case, to show his good character. In *Skidmore v. Star Ins. Co.*, 126 W.Va. 307, 27 S.E. 2d 845 (1943), the court rejected the admission of evidence of character to show conduct in civil cases and distinguished *Hess* on the ground that criminal intent was there material. McCormick on Evidence, 460, n. 94 (1972). Nevertheless, we are persuaded that when there is a plea of self-defense, or an issue as to who committed the first act of aggression, it is competent to show, through evidence of reputation, the dispositions of the parties. The character witness for the defendants was allowed by the trial court to put his answer in the record. He testified, for the record, that defendants' gen-

eral character and reputation were "good, excellent." Neither the question propounded nor the answer given was designed to show the disposition of defendants towards peacefulness or violence. This assignment of error is overruled.

[3] Defendants contend that the trial court committed error when it allowed the plaintiff's rebuttal witness, Ralph Barefoot, a police officer, to give his opinion concerning the distance at which a shotgun could inflict injuries of the type suffered by the plaintiff. We note that this question was important on the issue of self-defense pleaded by the defendants; however, the defendants objected generally to the question and failed to object specifically to the qualifications of the witness to so testify. Had the defendants objected specifically, the witness' qualifications could have been more fully developed. It is well settled that failure to lodge a specific objection that a witness is not qualified as an expert is waived if not made in apt time. 1 Stansbury, North Carolina Evidence, § 133 (Brandis Revision, 1973). This assignment of error is without merit.

Defendants contend that the trial judge erred in his charge to the jury on the issue of self-defense. We have reviewed the charge and find that it sufficiently stated and applied the law to the facts of the case.

In our opinion defendants had a fair trial free from prejudicial error.

No error.

Judges MORRIS and MARTIN concur.