DISTRICT OF COLUMBIA and Alfred Maury, Appellants,

v.

Patricia Joan THOMPSON, Appellee.

Nos. 86–1051, 86–1681.

District of Columbia Court of Appeals.

Argued Feb. 23, 1989.
Decided Feb. 12, 1990.

Donna M. Murasky, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

Joseph P. Hart, with whom James L. Coffin and Robert E. Glenn, Washington, D.C., were on the brief for appellee.

Before FERREN, BELSON, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

This case arose out of an employment dispute between appellee, Patricia Thompson, who was a library technician in the Northeast branch of the District of Columbia Public Library, and her supervisor, appellant Alfred Maury. Effective August 5, 1983, Thompson was fired. Thompson's notice of proposed discharge stated the reason as "Discourteous Treatment of your Supervisor," referring to an incident on May 25 in which Maury and Thompson each claimed an assault by the other. The notice described Thompson's assault of Maury, as well as other instances in which Maury had corrected Thompson's behavior and Thompson had responded in a "hostile, discourteous manner" with threats and name calling. In response to losing her job, Thompson filed suit against Maury and the District of Columbia. In her complaint, she described her version of the incident on May 25 and claimed Maury's actions constituted assault and battery and false imprisonment. Thompson also claimed that, because Maury's statements giving his version of the incident were false, his statements were defamatory. Thompson further alleged that Maury's "multivalent tortious actions" constituted intentional infliction of emotional distress. Thompson sued the District under the doctrine of respondeat superior.[1] Maury counterclaimed for assault and battery.

While Thompson's complaint appeared to be limited to the events surrounding the May 25 incident, the facts developed at trial were much more far-reaching. Thompson put into evidence her entire career with the library, both to show that she had been a satisfactory employee before her transfer to Northeast and to show Maury's treatment of her at Northeast. Thompson, for example, put into evidence twenty-two memoranda Maury had written about her. Thompson's attorney then argued to the jury that Maury had acted on a mission to have Thompson dismissed from the library, that Maury's entire pattern of behavior for two years had constituted intentional infliction of emotional distress, and that Maury had slandered and libeled Thompson for two years.

The jury found for Thompson on all counts, except on her claim of false imprisonment, and against Maury on his counterclaim. The jury awarded Thompson damages (excluding loss of wages and benefits) of $530 for the assault, $35,000 for defamation, and $42,500 for intentional infliction of emotional distress. The jury also awarded Thompson $280,000 for her loss of wages or diminished earning capacity attributable either to the defamation or to the intentional infliction of emotional distress.

Maury and the District filed this appeal, arguing primarily that (1) Thompson's claims were covered by the disability compensation provisions of the Comprehensive Merit Personnel Act, D.C.Code §§ 1–624.1 to –624.46 (1987), and, therefore, that Thompson was required to submit them initially to the District of Columbia Department of Employment Services (DOES), which had primary jurisdiction; (2) Thompson had otherwise impermissibly attempted to litigate her discharge, which was limited to an administrative remedy or, at least, to exhaustion of administrative remedies; (3) Maury's actions did not constitute intentional infliction of emotional distress as a matter of law; (4) with respect to the alleged defamation, Maury was absolutely privileged to make the statements about Thompson; and (5) as to the claims for assault and battery and defamation, the trial judge erred in excluding evidence of Thompson's prior assaults and threats, as well as evidence of Maury's good character. We agree with Maury's and the Dis-

---

1. Thompson also brought a count for negligent hiring and training by the District of Columbia, which she withdrew at the close of her evidence.

trict's first, third, and fifth claims of error. Accordingly, we must reverse and remand.

## I.

Patricia Thompson began working in the main branch of the District of Columbia Public Library on a part-time basis in 1973. In 1978, she was promoted one grade level and began working full time. In 1979, she was transferred to the Wilkinson branch and then to the Chevy Chase branch. In July 1980, she was transferred to the Benning branch. While at Benning, on January 26, 1981, Thompson underwent cataract surgery on her right eye. She was out for ten weeks. On her return, in March, her doctor wrote a note stating that Thompson could return to work from 1:00 p.m. to 7:00 p.m. for the next four weeks. On April 26, her doctor wrote another note, again recommending the same limited hours. In May 1981, Thompson was transferred to the Northeast branch, where Maury began supervising her.

The parties differ sharply over Thompson's record at the Library before and after her transfer to the Northeast branch. Thompson characterized her tenure with the Library as satisfactory until she arrived at the Northeast branch. Thompson noted, for example, that she regularly received in-grade step increases, which are automatic raises the employee receives on her anniversary date if the supervisor approves. In addition, Thompson was promoted once and, because of her supervisor's recommendations, began working more hours and finally full time. Thompson also characterized her performance evaluations as satisfactory.

In contrast, the District and Maury put on evidence showing that Thompson had not had a wholly satisfactory relationship with the Library before her transfer to Northeast. Thompson had previously complained about her supervisors and about problems with employees at the other branches. Her supervisor at the Benning branch testified that she had had periods of difficulty supervising Thompson because Thompson had had difficulties dealing with her co-workers and the public. Thompson

had lost her temper with members of the public and had had arguments in which she swore at her coworkers. In addition, Thompson took a lot of leave time. Usually Thompson took sick leave, but sometimes Thompson would anticipate leaving and yet not let her supervisor know that she was planning to take leave. Thompson received one poor review while at Benning that she refused to sign. When her supervisor gave her the review, Thompson became angry, used profanity, and knocked the contents of the top of her own desk to the floor.

The main dispute at trial concerned Thompson's tenure at the Northeast branch. Thompson put in evidence twenty-two memoranda that Maury had written about Thompson during her two years at Northeast. These memoranda, beginning in June 1981, repeatedly advised and warned her to follow the correct leave request procedures and notified her of problems in the performance of her duties, including conflicts with a summer employee, inaccuracy in putting information into the computer, and insubordination and rudeness to staff and patrons. Thompson claimed that all these memoranda were false, that they defamed her, and that, by writing the memoranda and harassing her, Maury intentionally had inflicted emotional distress. Thompson testified that some of the memoranda blamed her for not doing tasks when she either had been told not to do them or had been asked to do other work. Thompson also testified that some of the memoranda either mischaracterized her disputes with Maury or were absolutely false. She felt some of the other memoranda were excessively critical, and she said they contained complaints that Maury had not told her in person.

At trial, Maury defended the accuracy of these memoranda. Maury testified that during Thompson's two years at the Northeast branch he had had two to four problems per week with her. Maury stated that he had discussed the problems in person with Thompson and tried to learn her side each time. He said he finally had started writing memoranda because he was

required to do so as a supervisor. These memoranda, contemplated by the union contract, were either "letters of warning," meant to correct the employee, or "letters of direction," more strongly worded corrections. Maury testified that he did not document all the problems with Thompson in these memoranda.

Althea Neal, Thompson's direct supervisor at the Northeast branch, supported Maury's testimony. She stated that problems with Thompson had begun shortly after her arrival. Thompson kept repeating mistakes in entering information into the computer and cursed Neal whenever Neal called the mistakes to Thompson's attention. According to Neal, Thompson also took excessive leave, as much as four days per week, without requesting it in advance. Neal received complaints from library patrons about Thompson, and Thompson did not get along with her co-workers.

The incidents underlying some of the memoranda were discussed extensively at trial. The first memorandum referred to a meeting Maury had called in response to complaints by other staff members. Maury, Neal, Thompson, and Ernest Dixon (another library employee) met to discuss problems in the allocation of library tasks. According to Maury's testimony, during the course of the meeting Thompson began verbally abusing Neal, calling her a liar and other names. As a result of this meeting, Maury recommended that Thompson be transferred or dismissed, a recommendation that did not result in any personnel action. Thompson also testified about the meeting, denying that she had refused to do work or that she had come back late from breaks and lunch. She admitted calling Neal a liar but denied calling her other names. Thompson further testified that the meeting had ended when she told Maury that he was creating conflicts among the employees and that, as far as she was concerned, the meeting was over.

Thompson became eligible for a within-grade step increase in August 1981. While Maury recommended the increase, he also wrote a memorandum to the personnel department that Thompson's performance was barely satisfactory and that further documentation would show Thompson was "certifiably unsatisfactory." Thompson testified that she had never received a copy of this additional memorandum and that Maury was supposed to have shown her the recommendation.

A continuing source of controversy was Thompson's leave-taking. During her time at the Northeast branch, Thompson continued to work limited hours because of her eye condition. The reduction in her working hours counted as sick leave. Thompson testified that Maury had told her he could give her annual leave on the same day she requested it but that Maury, nonetheless, had written Thompson several memoranda about the need for requesting annual leave in advance to aid scheduling. Thompson also testified that Maury continued to be insensitive to her eye condition. One example of this insensitivity, she said, occurred when Thompson was assigned to work at another branch. She took sick leave because of her eye condition, but Maury reported her as absent without leave. Thompson wrote a memorandum to personnel stating she had called in and requested sick leave for that day. Her request had been granted, and no action was taken against her.

Maury and Neal testified, in contrast, that Thompson's leave-taking made scheduling at the library difficult. Thompson would call and say she was taking time off that day. Maury tried to accommodate Thompson's sick time, approving the leave when she asked for it, but he began writing "letters of direction" when he, himself, received word from his superiors to tighten up on leave time. (Thompson acknowledged on cross-examination that she took eighteen weeks of leave during 1981 and fourteen weeks of leave during 1982 while at Northeast.) Maury further testified that he wrote the memorandum reporting Thompson as absent without leave only after hearing from the supervisor at the other branch that Thompson did not show up or call to ask for leave.

In May 1982, Thompson filed a grievance with the union requesting a computer test to show that she had the necessary skills to be promoted one grade level. In 1981, Thompson had received the Library's standard computer training program, and by mid–1982 she felt her computer skills qualified her to advance. At a grievance hearing on May 11, 1982, Maury testified, as he did later at trial, that he did not think a computer test was appropriate because his branch was short of staff and because Thompson's past behavioral problems meant that an additional test and, if necessary, further training would not help Thompson get promoted. Maury also testified that Thompson became so abusive at the hearing that she had to be removed from the building. After the hearing, according to Maury, Thompson announced that she did not feel well. She took the rest of the day off and the next day off as well. Maury testified that he approved one day of leave but not the second day. On May 12, 1982, Maury wrote a memorandum to personnel explaining that he had decided not to give Thompson a computer test because of her "uncontrollable emotions" and the fact that she was not promotable at that time. He also sent Thompson a "letter of direction" on that date warning her against taking leave without prior permission and disapproving her leave for May 12. He later changed her time off on May 12 to absence without leave.

Thompson testified at trial that she had felt she was qualified for a grade increase but that Maury had been stalling in approving her promotion. The hearing had made her very upset, she said, and had given her a migraine headache. Contrary to Maury's testimony, Thompson testified that Maury had approved leave for both days and even had said that if she did not have enough leave time, she could take the time without pay.

In September 1982, Thompson filed a complaint with the Equal Employment Opportunity Office requesting computer training. Dorothy Gray, who was the personnel officer assigned to the complaint, suggested that Neal give Thompson some additional training. Maury opposed the request because Neal had been temporarily transferred to another branch and because of other problems, including Thompson's rudeness and abuse of leave-taking.

As part of the regular library procedure required by the union contract, Thompson received annual performance evaluations. Her first performance rating at the Northeast branch in April 1982, for the period covering April 1981 to March 1982, had been mixed, with some checks for "satisfactory" and some minuses for "needs improvement." At the end of December 1982, Maury sent Thompson a "warning of unsatisfactory performance rating." This warning was a notice, required by the union contract, sent at least ninety days before the employee received an unsatisfactory rating which could then become the basis of adverse action. In this warning letter, Maury detailed the reasons for the unsatisfactory rating: problems of rudeness to patrons, inaccuracies in putting information into the computer, refusal to do assigned duties, and inappropriate leave-taking. Thompson sent a memorandum to personnel disputing the unsatisfactory evaluation. She also testified that, although Maury was supposed to help her improve her performance if it needed improvement, he never did so during her two years at the Northeast branch. Maury was unknowledgeable about the computer, she said, and, rather than help her, he wrote memoranda criticizing her. Thompson further testified that Maury also had refused to send her to another branch to improve her skills.

In May 1983, Maury and Thompson had the altercation that led to Thompson's being fired. On May 24, Maury gave Thompson a "letter of warning" about incorrect leave-taking. The next day, Thompson saw Maury as he entered the library. Maury testified that Thompson, who was angry about the letter, confronted him. She shouted at him, called him names, and finally threw a rubber stamp at him. He testified that he left the area and that Thompson followed him to his mezzanine office, shouting at him, blocking the door, and pushing his shoulders back when he

tried to pass. Maury denied touching or pushing Thompson on May 25.

Thompson testified that, on May 25, she asked Maury about the "letter of warning" and that he insulted her. She told him to "lay off me" and went to the kitchen. She further testified that he followed her there and blocked the door. Then, said Thompson, after she left, Maury followed her to the mezzanine where he shouted and pointed his finger at her. Thompson testified that when she told Maury to stop harassing her, he pushed her against the wall. According to Thompson, after she left, Maury followed her downstairs and pointed his finger at her again, saying, "There's more where that came from, baby." Thompson testified that, as a result of this incident, she was very upset and had sharp back pains that required her to take two days off and to go to the hospital for treatment.

After the altercation, both Maury and Thompson called Sigrid Washington, Maury's direct supervisor. Maury got through to Washington and recounted Thompson's assault on him. Thompson was unable to get through to Washington but did speak to June Sweeney, Washington's supervisor. Sweeney came to the Northeast branch and discussed the incident with Washington, Maury, and Thompson. As a result of the discussion, Maury wrote a memorandum to Washington explaining his version of the events and recommending that Thompson be dismissed. Thompson wrote a memorandum to Sweeney explaining her version of the events and threatening to seek professional advice if the library did not "handle the matter." Washington and Sweeney, however, concurred in Maury's recommendation to fire Thompson.

On June 20, 1983, Thompson received her last performance evaluation. It rated her unsatisfactory. Thompson refused to sign it. Thompson testified that she felt deceived, destroyed, and taken advantage of by the report. She testified that, after receiving the report, she went to a psychiatrist because she had trouble coping with the assault and the rating. Thompson filed an objection to her unsatisfactory performance evaluation and requested an impartial review. Later in June 1983, Sweeney acted as the impartial reviewer. Sweeney asked Thompson specific questions about her job duties, such as how to operate the computer. Sweeney concluded that Thompson could not adequately perform her job duties and, therefore, that the unsatisfactory rating should stand.

On June 22, 1983, Thompson received a proposed notice of discharge. This letter gave Thompson a thirty-day notice that she would be terminated and explained her appeal rights. The letter stated the reason for termination as "Discourteous Treatment of your Supervisor." The letter described Thompson's assault of Maury, as well as an earlier incident in which Thompson had threatened Maury. The letter also stated that, as to the penalty, Thompson's past record of threats, outbursts, and discourteous behavior had been considered. Thompson testified that she was in shock because the library took Maury's side of the events without getting her version. Thompson grieved this termination through her union, but the termination was upheld.

Thompson testified that after she was fired she had trouble holding another job. She did not work continuously because she had flashbacks of Maury's assault on her and because she cried a lot. When she could not work, she sat around the house, gained weight, drank, and separated herself from friends and family.

At trial, Thompson called Dr. Francis Board, a psychiatrist, to testify as to the ongoing mental effects she suffered. He testified that Thompson suffered from a "major affective disorder." While he opined that she had partially recovered from this disorder by October 1985, he stated that the prospects for Thompson's future recovery were "guarded." Thompson also called Joseph Tryon, an economist, who testified about Thompson's lost income. Tryon compared Thompson's current income, projected over her expected working life, to what he estimated she would have earned in the library system. He then discounted the difference by an interest rate of six percent. In his opinion,

her lost income, discounted to its net present value, was $291,453.

The District also put on evidence of Thompson's mental condition. Dr. Thomas Goldman testified that, at the time of her discharge, Thompson suffered from an "adjustment disorder with a mixed disturbance of emotions and conduct." He disagreed with Dr. Board that Thompson suffered from a "major affective disorder." According to Dr. Goldman, Thompson's symptoms were not severe enough to warrant that diagnosis. Dr. Goldman also testified that Thompson's disorder was transient, not permanent, and could be treated effectively.

The trial court denied each side's motion for a directed verdict. The jury returned its verdict for Thompson. The District and Maury filed this timely appeal.

## II.

■ The District contends that Thompson's common law claims against the District are precluded by the exclusivity provision of the disability compensation portion of the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–624.2 to –624.46 (1987). Section 1–624.16(c) provides:

The liability of the District of Columbia government ... under this subchapter ... with respect to the injury or death of an employee, is exclusive and instead of all other liability of the District of Columbia government ... to the employee ... in a direct judicial proceeding, [or] in a civil action....

"This provision ... has been construed as limiting the government's tort liability only for injury or death within the scope of the Act." *Tredway v. District of Columbia,* 403 A.2d 732, 734 (D.C.) (construing the Federal Employees Compensation Act (FECA), which is identical to the disability compensation portion of CMPA), *cert. denied,* 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 92 (1979). We conclude, accordingly, that an employee may sue the District if, but only if, the employee's injury falls outside of the scope of CMPA. Otherwise,

the employee may seek compensation only through an administrative proceeding before the agency charged with administering the disability compensation provisions of CMPA, the District of Columbia Department of Employment Services (DOES).[2]

■ In the interests of uniform application of the law, moreover, if there is a "substantial question" whether an employee's injury is covered by CMPA, the employee must submit her claim to DOES. She may then sue the District only if the claim is disallowed. *See Tredway,* 403 A.2d at 734–35; *Reep v. United States,* 557 F.2d 204, 207 (9th Cir.1977) (construing prerequisites under FECA to Federal Tort Claims Act (FTCA) suit against the United States); *Bailey v. United States, through the Dep't of the Army,* 451 F.2d 963, 965 (5th Cir.1971) (same). A substantial question arises unless the injury is "clearly" not compensable under CMPA. *Tredway,* 403 A.2d at 735.

■ The first issue we must address, therefore, is whether Thompson's claims suggest a "substantial question" as to whether they fall within CMPA and, therefore, require her to submit her claims to DOES before filing a common law suit against the District. We consider, initially, Thompson's claimed mental injuries. We have held that certain types of mental injuries are not covered. In *Mason v. District of Columbia,* 395 A.2d 399 (D.C.1978) (construing federal law identical to CMPA), the plaintiff filed an action for assault and battery, false arrest, and false imprisonment. She claimed that she had endured "mental suffering," as a result of "humiliation," and "embarrassment" caused by the underlying acts. *Id.* at 402–03. We held that this "mental suffering" alleged by Mason was not an "injury" within the meaning of the Act. *Id.* at 403. We also held that Mason had not alleged any "disability" caused by her injuries. *Id.* at 403–04. Because Mason's claims did not fall within the federal act, we reversed a dismissal of her claims. *Id.* at 404. Similarly, in *Newman v. District of Columbia,* 518 A.2d 698, 705–06 (D.C.1986), a case decided under

2. 27 D.C.Reg. 2732; 28 D.C.Reg. 1008–15 (1981).

CMPA, we held that allegations of "humiliation," "embarrassment," "public ridicule," and "personal indignity" did not amount to an "injury" within CMPA and that, because the appellant in *Newman* did not claim he was disabled by his injuries, CMPA was inapplicable.

Not all claims for mental injuries fall outside of CMPA, however. This court in *Mason* distinguished claims for "general mental distress," such as those in *Mason*, from claims for "particular and medically definable mental and emotional illnesses and conditions" not present in *Mason*. 395 A.2d at 403 n. 5. We acknowledged that claims for "various kinds of mental injury causally related to ... employment" do fall within the scope of the Act, citing instances where claimants had received compensation. *Id.* at 403.

Like the plaintiffs in *Newman* and *Mason*, Thompson alleged in her complaint that she had suffered "embarrassment, gross physical abuse, pain, mental anguish, anxiety, turmoil and suffering, humiliation, intimidation and enforced solicitude." She did not allege that she was disabled because of these injuries. In her pretrial statement, however, Thompson proposed calling Dr. Board to describe the "major affective disorder" which Thompson claimed she had suffered as a result of her injuries on the job. This supplemental pretrial statement, therefore, changed Thompson's claims. It made them different from those in *Newman* and *Mason*, for Thompson now claimed that she not only had endured mental suffering but also had incurred permanent and serious psychological injuries. While her claims of mere embarrassment and mental anguish are not "injuries" within the meaning of CMPA, see *Newman*, 518 A.2d at 705; *Mason*, 395 A.2d at 403, there is at least a substantial question whether the type of psychological injury Thompson alleged, a major affective disorder, falls within CMPA. *See Mason*, 395 A.2d at 403 n. 5.

In the parties' Joint Pretrial Statement, moreover, Thompson again alleged that, because of the "mental devastation" she had suffered, she was unable to obtain full-time employment. Thompson proposed calling Joseph Tryon, an economist, to testify about her future lost wages attributable to her injuries. The addition of Tryon's proposed testimony, therefore, also helped enlarge Thompson's claims in a way that raised at least a "substantial question" of whether she had suffered a mental disability.

It is true that CMPA does not contain a definition of the term "disability." The District of Columbia Workers' Compensation Act (WCA) that applies to private employers, however, defines "disability" as "physical or mental incapacity because of injury which results in the loss of wages." D.C.Code § 36–301(8) (1988). *See also* 2 A. LARSON, WORKMEN'S COMPENSATION LAW § 57.11 (1987) ("disability" means disability in the medical or physical sense that leads to an inability to earn wages). Moreover, this court in *Smith v. District of Columbia Dep't of Employment Servs.*, 548 A.2d 95, 100 (D.C.1988), explained that compensation under WCA is predicated upon injuries that cause the "loss of wage earning capacity, or economic impairment...." While the WCA and accompanying caselaw are not directly applicable, and while Thompson did not specifically allege that she was "disabled" because of her injuries, the conceptual closeness of WCA to CMPA, coupled with the expansion of Thompson's claim, as evidenced by the proffered testimony of her experts, effectively turned the claim of mental injuries into one of mental disability at least arguably within the scope of CMPA.

■ Thompson replies that CMPA, nonetheless, does not preempt her claim of mental injury, let alone her claim of physical injury, because CMPA does not cover injuries caused by intentional torts. She says that CMPA's definition of "injury" as "injury by accident," D.C.Code § 1–624.1(5) (1987), excludes intentional injuries. While this court has not expressly determined whether intentional torts inflicted by co-workers or supervisors fall outside of CMPA coverage, we said in *Tredway*—a case involving an attack on an employee by strangers—that "[p]hysical attacks by

third parties sustained in the performance of the employee's duties are clearly covered by FECA." [3] 403 A.2d at 735. We relied on two cases decided under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) holding that assaults by co-workers were compensable injuries, *Penker Constr. Co. v. Cardillo,* 73 App. D.C. 168, 118 F.2d 14 (1941); *Hartford Accident & Indemnity Co. v. Cardillo,* 72 App.D.C. 52, 112 F.2d 11, *cert. denied,* 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940). Similarly, in the context of the WCA, we have held that injuries caused intentionally by strangers or by co-workers are compensable and thus require employees to submit claims for workers' compensation benefits before filing suit. *Grillo v. National Bank of Washington,* 540 A.2d 743 (D.C.1988) (teller killed by bank robber); [4] *Harrington v. Moss,* 407 A.2d 658 (D.C.1979) (assault by supervisor). Applying the reasoning of *Tredway* under the identical federal provision, as well as the analysis in cases interpreting the WCA, we conclude that Thompson's claims of intentional torts committed by a co-worker raise at least a substantial question whether they are covered by CMPA.

■ In sum, while, under *Mason* and *Newman,* Thompson would not have been required to file a claim with DOES based on the allegations about mental injuries in her original complaint, her pretrial statements expanded those claims markedly and thus created a "substantial question" whether they fall within CMPA. Moreover, Thompson's assault and battery claim against Maury, and thus derivatively against the District, also presents a substantial question under CMPA since this physical injury allegedly contributed to Thompson's disability and intentional torts by co-workers are not necessarily excluded from CMPA coverage.

■ One issue remains, however. The District did not object, before or during trial, on the ground of CMPA coverage. We therefore must consider waiver. We have never decided whether the requirement that claimants submit claims to an agency before filing suit—the defense of "primary jurisdiction"—can be waived if not raised before or during trial. A question of "primary jurisdiction" arises when a claim may be cognizable in a court but initial resolution of issues within the special competence of an administrative agency is required. *See Grillo,* 540 A.2d at 749; *Drayton v. Poretsky Management, Inc.,* 462 A.2d 1115, 1118 (D.C.1983); *Harrington,* 407 A.2d at 661.

■ "Primary jurisdiction," like the doctrine of "exhaustion of administrative remedies," is concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R.,* 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956). We generally defer to agencies for initial resolution of issues the legislature has put in their special competence. *Harrington,* 407 A.2d at 661. There are two reasons for this doctrine: uniformity of result and application of the specialized and expert knowledge of the agency. *Drayton,* 462 A.2d at 1118 (citing *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct.

---

**3.** As to the argument that Tredway's type of injury was not causally related to Tredway's type of employment, we stated that all that is required to connect the injury to the employment is that the "injury result from a risk incidental to the environment in which the employment places the claimant." *Tredway,* 403 A.2d at 736. Similarly, Thompson's claim that she suffered a major affective disorder attributable to harassment and an assault on the job raises at least a substantial question whether they are attributable to a risk inherent in the job environment.

**4.** In *Grillo,* we distinguished "injuries specifically intended by the employer to be inflicted on the particular employee," which are not accidental within the meaning of the WCA and thus may serve as the basis for a lawsuit. 540 A.2d at 744, 748. This limitation, however, extends only to those persons who are "realistically the alter ego of the corporation" and not merely a supervisory employee. *Rustin v. District of Columbia,* 491 A.2d 496, 501 (D.C.) (quoting 2A LARSON § 68.22) (interpreting LHWCA identical to WCA), *cert. denied,* 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985). Thompson has not alleged that the library intended Maury to assault or defame her.

492, 96 L.Ed. 576 (1952)). These concerns are especially applicable in the context of CMPA, where the statute gives authority to DOES to determine all questions of the District's liability under the statute. D.C. Code § 1–624.40.

Some courts have held that the primary jurisdiction defense cannot be waived. *See Distrigas of Massachusetts Corp. v. Boston Gas Co.*, 693 F.2d 1113, 1117 (1st Cir.1983); *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 365 n. 37, 512 F.2d 527, 542 n. 37 (1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Louisiana & Arkansas Ry. v. Export Drum Co.*, 359 F.2d 311, 314 (5th Cir.1966); *see also Western Pac. R.R.*, 352 U.S. at 63, 77 S.Ct. at 164 (issue of primary jurisdiction considered *sua sponte*); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334 (1st Cir.), *cert. denied*, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970) (same). These courts looked at the reasons behind the doctrine and concluded that the parties cannot waive it "since the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." *Distrigas*, 693 F.2d at 1117. We agree with the rule established by these other courts. We hold that the District has not waived the defense of primary jurisdiction.

Because Thompson's claims against the District raise a substantial question of coverage by CMPA, we must remand to the trial court with directions to stay this proceeding as against the District of Columbia until Thompson has had a reasonable time to file for disability benefits under CMPA. If DOES concludes that Thompson's injuries are within the scope of CMPA,[5] then the trial court must vacate the judgment against the District and dismiss this action.[6] If, however, DOES concludes that Thompson's injuries are not within the scope of CMPA, then, because of our reversal on other grounds, the trial court may order a new trial as to the District.

Because the remand and stay as to the District do not affect Thompson's claims against Maury in his individual capacity,[7] we proceed to the other issues, recognizing that their resolution as to Maury also may affect the District's derivative liability in the event DOES rules that CMPA is inapplicable. We therefore proceed as though both appellants—the District and Maury—are advancing the remaining arguments even though the focus now is only on Maury's alleged liability.

### III.

Appellants next argue that Thompson's claims, in effect, challenge her dismissal

---

**5.** If Thompson's claims are within the scope of CMPA, there is still the question whether they are timely under D.C.Code § 1–624.22—a question for DOES in the first instance.

**6.** We do not consider the question whether Thompson can lawfully sue the District if DOES concludes Thompson's injuries fall within the scope of CMPA but disallows benefits for some other reason. There is dicta in *Newman* to the effect that the exclusivity provision of the disability portion of CMPA applies only if the employee receives benefits under the statute. *Newman*, 518 A.2d at 704–05. This discussion in *Newman*, however, is at odds with earlier cases interpreting FECA. *See Tredway*, 403 A.2d at 734–35 ("[T]he general rule is that the compensation act remedy is exclusive, even though under the facts of the particular case no compensation is payable or even though the compensation act fails to provide for the full extent of the employee's damages."). In addition, CMPA provides exceptions from coverage in certain circumstances, D.C.Code § 1–624.2, such as the *willful* misconduct of the employee, *id.* at § 1–624.2(1). It is unclear whether the dicta in

*Newman* was intended to modify existing interpretations of FECA and to create a situation in which an employee, although within the coverage of CMPA but disqualified from benefits, could still sue the District in tort. We do not decide this issue, but we note that if this situation arises after the remand, it could be raised for resolution in the trial court.

**7.** No one has suggested that Maury should be exempted from liability if the District is immune under D.C.Code § 1–624.16(c). Accordingly, we do not address this theoretical possibility. While cases interpreting FECA have held that the exclusivity provision does not affect the liability of coemployees, *see Heathcoat v. Potts*, 790 F.2d 1540 (11th Cir.1986), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 747, 98 L.Ed.2d 761 (1988); *Bates v. Harp*, 573 F.2d 930 (6th Cir.1978); *Allman v. Hanley*, 302 F.2d 559 (5th Cir.1962), we do not intend implicitly to foreclose the possibility of a different interpretation of CMPA if the question is properly raised.

for cause and, therefore, that CMPA should be construed either to preclude a court claim altogether or at least to require exhaustion of her administrative remedies before she can file suit. Appellants argue, more specifically, that the CMPA and the union contract establish a comprehensive regulatory scheme for dealing with grievances and that allowing Thompson to file suit evades and undercuts these procedures. As evidence of this comprehensive scheme, appellants note that Thompson had other options available to challenge her discharge and alleged mistreatment by Maury, such as an appeal to the Office of Employee Appeals (OEA), D.C.Code § 1-606.3 (1987), or, if union representation was inadequate, the filing of a complaint with the Public Employees Relations Board (PERB), *id.* § 1-605.2(9) (1987).

We decline to hold that the provisions of CMPA which provide for employee performance evaluations, D.C.Code §§ 1-615.1 to -615.5 (1987), and govern adverse actions, *id.* §§ 1-617.1 to -617.3 (1987), either preclude common law claims against supervisors and the District or require exhaustion of administrative remedies. These provisions, unlike the disability provisions discussed above in Part II, do not state that they are exclusive. *Compare id.* § 1-624.16(c) *with id.* §§ 1-615.1 to -615.5 *and* 1-617.1 to -617.3. Nor is there any other requirement of exhaustion of administrative remedies before an employee can pursue her common law causes of action against the District. Appellants cite no

case in the District of Columbia for this proposition[8] but argue instead that some federal courts have ruled that comprehensive administrative schemes such as CMPA preempt common law claims. The federal cases on which appellants rely, however, were decided on the basis of federal preemption of state law,[9] a doctrine not applicable in the present case.

The question, then, is whether the provisions of CMPA that address employee grievances have abrogated common law causes of actions for torts relating to these grievances. There is nothing in this portion of the statute suggesting it is an exclusive remedy, and we will not construe a statute as altering the common law beyond what the words of the statute require. *See Dell v. Department of Employment Servs.*, 499 A.2d 102, 107 (D.C.1985). We therefore conclude that the employee performance evaluation and adverse action provisions of CMPA do not bar Thompson's common law tort claims or require exhaustion of administrative remedies.

## IV.

We turn to the merits. Appellants contend the trial court erred in denying them a directed verdict on the count of intentional infliction of emotional distress because the acts complained of were not sufficiently "outrageous" as a matter of law. To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) 'extreme and outrageous'

---

8. Thompson's claims are different from those in *Hawkins v. Hall,* 537 A.2d 571 (D.C.1988), and *Pender v. District of Columbia,* 430 A.2d 513 (D.C.1981), in which we required exhaustion of administrative remedies before allowing suit. In *Hawkins,* the plaintiffs challenged the Board of Education's deduction of union dues after the expiration of a collective bargaining agreement as an unfair labor practice. We upheld the dismissal of the plaintiffs' claims, requiring exhaustion of administrative remedies before the PERB. In *Pender,* a police officer was suspended without pay pending criminal charges that resulted in his acquittal. When he sued for restoration of pay, we dismissed his suit concluding he had not exhausted his administrative remedies before the Commissioner of the District of Columbia or the Civil Service Commission. The doctrine of exhaustion of administrative remedies is inapplicable to Thompson's

common law tort claims, however, because, unlike the claims in *Hawkins* and *Pender,* the administrative agencies, OEA and PERB, cannot provide the relief Thompson seeks. *See Goode v. Antioch Univ.,* 544 A.2d 704, 706 (D.C.1988).

9. *See David v. United States,* 820 F.2d 1038, 1043 (9th Cir.1987) (federal employee's claim for intentional infliction of emotional distress preempted by Civil Service Reform Act); *Truex v. Garrett Freightlines, Inc.,* 784 F.2d 1347 (9th Cir.1985) (claims for harassment and emotional distress preempted by federal labor law); *Buscemi v. McDonnell Douglas Corp.,* 736 F.2d 1348 (9th Cir.1984) (claim for wrongful discharge by employee, a union member whose employment was governed by collective bargaining agreement, preempted by federal labor law).

conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *see also Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980). The law, therefore, does not impose liability for all conduct causing mental distress. *Clark v. Associated Retail Credit Men of Washington, D.C.,* 70 App.D.C. 183, 185, 105 F.2d 62, 64 (1939) (no "general duty of care to avoid causing mental distress"); *see also* RESTATEMENT (SECOND) OF TORTS § 46 comment d (no liability for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"). A defendant is only liable for acts " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *Jackson v. District of Columbia,* 412 A.2d 948, 957 (D.C.1980) (quoting RESTATEMENT (SECOND) OF TORTS § 46 comment d).

The requirement of intentional or reckless conduct that is outrageous strikes the balance between preventing the harms of mental distress and allowing beneficial activities that nonetheless may result in some harms. *See Clark,* 70 App.D.C. at 185–86, 105 F.2d at 64–65. Thus, the court, in determining whether the conduct is outrageous, shall consider, first, the nature of the activity. *See Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 823 (Minn. Ct.App.1988) ("If the claimed distress is the type people commonly encounter and endure in their lives, the claim should not be submitted to a jury."); *Cafferty v. Garcia's of Scottsdale, Inc.,* 375 N.W.2d 850, 855 (Minn.Ct.App.1985) (dismissal by placing totally unexpected termination notice on employee's desk and then meeting privately with him a few minutes after he arrived for work, terminating him and sending him on his way not outrageous conduct); *Hill v. Kinston,* 92 N.C.App. 375, 374 S.E.2d 425 (1988) (termination carried out in responsible manner not outrageous). The court, if necessary, may also consider whether the activity is privileged. *See Waldon,* 415 A.2d at 1077.

◼ Assessing Thompson's claims under this standard, we agree with Maury and the District. We conclude as a matter of law that the conduct Thompson complains of was not sufficiently outrageous to warrant recovery. Thompson's claim of intentional infliction of emotional distress rests on the following actions: Maury criticized her in memorandum after memorandum; he approved her leave and then changed her status to absence without leave; he refused to consider her for promotion to the next grade level or to give her the computer test she asked for; he isolated her from the other employees; he requested statements from her doctor as to her limited hours; he wrote memoranda on her excessive leave; and he assaulted her and lied about it, resulting in her job loss.

◼ With the exception of the alleged assault, this conduct by a supervisor is of a type inherent in the employment situation and, on this record, was not unusually egregious. Maury wrote memoranda to Thompson advising her of problems in her performance in accordance with the union contract, and the contents of the memoranda, even if false as Thompson alleges, are not outrageous. Nor was the alleged assault—pushing Thompson against the wall and pointing of finger, coupled with threatening words—sufficiently egregious under the applicable standard. *See International Sec. Co. of Virginia v. McQueen,* 497 A.2d 1076 (D.C.1985); *Sztan v. Seilers Corp.,* 608 F.Supp. 344, 345–46 (D.D.C. 1985) (citing *Shewmaker v. Minchew,* 504 F.Supp. 156, 163 (D.D.C.1980), *aff'd,* 215 U.S.App.D.C. 53, 666 F.2d 616 (1981) (per curiam)).

Thompson's claims are similar to those in *Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C.1984), where we rejected Best's argument that her allegations of interference with her professional responsibilities as department chair constituted intentional infliction of emotional distress. We held that "[s]uch employer-employee conflicts do not, as matter of law, rise to the level of outrageous conduct." *Id.; see also Hogan v.*

*Forsyth Country Club, Co.,* 79 N.C.App. 483, 493–94, 340 S.E.2d 116, 122–23 (1986) (supervisor's screaming and shouting at employee, calling her names, interfering with her supervision of subordinates, throwing menus at her, and finally firing her not extreme and outrageous conduct).

▆▆ Thompson further argues, however, that, even if Maury's actions were not in themselves outrageous, Maury acted with knowledge that he was causing severe emotional distress. We agree that acts which are not generally considered outrageous may become so when the actor knows that the other person is peculiarly susceptible to emotional distress. *See Anderson v. Prease,* 445 A.2d 612, 613 (D.C.1982) (sufficient evidence of outrageous conduct where defendant-physician who prescribed valium for plaintiff, his patient, and therefore knew of plaintiff's fragile condition, cursed her and screamed that she should leave his office); *Tandy Corp. v. Bone,* 283 Ark. 399, 406–09, 678 S.W.2d 312, 316–17 (1984) (evidence sufficient for jury finding of extremely outrageous conduct where employee not permitted to take his medication during day-long interrogation and required polygraph test). The rule established by these cases applies when the defendant is aware of some special sensitivity on the part of the plaintiff and acts either ignoring or exploiting this sensitivity.

▆▆ To make this argument, Thompson relies on Maury's affirmative answers at trial to two questions: whether Thompson "was very upset with all the documents [Maury] had been serving on her" and whether Thompson was "starting to show signs of being emotionally upset." Contrary to Thompson's assertions, however, this evidence does not show that Maury acted with knowledge that Thompson was unusually sensitive and likely to suffer "extreme emotional distress." This evidence only shows that Maury knew Thompson was unhappy with, or perhaps despondent about, the criticism she was receiving from her supervisor.

Because the conduct underlying Thompson's claim for intentional infliction of emo-tional distress was not "outrageous" as a matter of law, we remand to the trial court for dismissal of that claim.

## V.

The next claim is defamation. Appellants contend the trial court erred by refusing to grant a directed verdict in their favor on this count because there is no evidence the allegedly defamatory documents were published and, in any event, because these documents were absolutely privileged.

## A.

▆▆ Appellants maintain there is no evidence that Maury's statements were "published" because they were not disseminated outside of the Library. We disagree. To establish a cause of action for defamation, a plaintiff must show that defamatory statements were "published," *i.e.,* that they were "communicated to some person other than the one defamed." *Tocker v. Great Atl. & Pac. Tea Co.,* 190 A.2d 822, 823 (D.C.1963); *see* RESTATEMENT (SECOND) OF TORTS § 577(1) (1977) ("Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed."); W.P. KEETON, PROSSER & KEETON ON TORTS § 113, at 798 (5th ed. 1984) ("There may be publication to any third person."). Based on this standard, Thompson has shown that the statements she claims defamed her, especially Maury's statements that Thompson assaulted him, were communicated to third parties.

More specifically, Maury called Washington after the incident and reported the incident to her. He met with Sweeney, Washington, and Thompson to discuss the incident, and he sent a memorandum describing the incident to Washington. Many of the other memoranda Thompson claims are defamatory were sent directly to the personnel department. Appellants have not specifically identified any relevant writing that was not sent to third parties and therefore was not "published."

Appellants cite *Howard Univ. v. Best,* 484 A.2d 958 (D.C.1984), for the proposition that statements not disseminated outside the library are not "published." *Best,* however, is inapposite. There, the College of Pharmacy Management Committee circulated to the faculty a report prepared by outside consultants that was critical of Dr. Best, the chair of the Department of Pharmacy Practice. Dr. Best contended that the report "was defamatory and was circulated outside the University." *Id.* at 988. She noted, for example, that "at several professional meetings around the country she was told 'I understand you can't get along with the dean, that they had to can you.'" *Id.* On cross-examination, however, she testified "that she did not know who had circulated the report beyond the faculty and could not identify anyone, outside of the faculty, who had seen the report." *Id.* This court said:

> The trial court directed a verdict against her on the grounds that the evidence established a qualified privilege; there was insufficient evidence of publication outside of the faculty; and the report was not defamatory on its face and Dr. Best had not proved a defamatory meaning. We affirm on the grounds that the report was not demonstrated to be defamatory and there was insufficient evidence of publication.

*Id.* We added in a footnote: "Because we agree with the trial court that the report was not defamatory, we need not determine the existence of a qualified privilege." *Id.* (citation omitted).

Although we ruled on two grounds, including "insufficient evidence of publication," it is clear that the issue of publication—indeed, of the defamation itself—was limited to alleged dissemination of a defamatory report outside the university; there was no claim that distribution of the report to the faculty was a publication that defamed Best. *See id.* at 988–89. Accordingly, *Best* does not come to grips with the question whether dissemination of a defamatory report within a faculty—or, as in this case, within a group of employer-supervisors and their assistants—is a "publication."

Given our decision in *Tocker,* as well as the definition of "publication" in the Restatement (Second) of Torts § 577(1), it is clear that any communication to someone other than the person defamed is a publication. Thus, the basis, if any, for excusing dissemination of a defamatory report within a faculty (as in *Best*) or within an employment group as in this case is not the lack of a publication but the existence of a qualified privilege—a privilege which can be lost if the publication occurs outside normal channels, is otherwise excessive, or was made with malicious intent. *See Thomas v. Howard,* 168 A.2d 908, 910 (D.C.1961) (employer investigating employee's business conduct); *Greenya v. George Washington Univ.,* 167 U.S.App.D.C. 379, 386, 512 F.2d 556, 563 (faculty discussing qualifications of colleagues), *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975) (cited in *Best,* 484 A.2d at 989). We therefore turn to the question of privilege.

### B.

Appellants argue that the trial court erred by not granting a directed verdict for Thompson's defamation claims because Maury was absolutely privileged to make the statements. Appellants present three arguments: (1) Thompson consented to the statements; (2) the documents were required by law; and (3) Maury, as a government official, was absolutely immune from suit.

Appellants did not raise their "consent" argument in the trial court and, therefore, may not raise it on appeal. *See President & Directors of Georgetown College v. Diavatis,* 470 A.2d 1248, 1251 (D.C.1983); *District of Columbia v. Gray,* 452 A.2d 962, 964 (D.C.1982). As to their second argument, this court has held that an employer who is required by law to file a confidential "separation report" with the local unemployment compensation board is "absolutely privileged" against a libel action based on the contents of the report. *See Goggins v. Hoddes,* 265 A.2d 302, 303 (D.C.1970). Many years earlier, the Court of Appeals for the District of Columbia had accorded

an absolute privilege to communications by the Commissioner of Indian Affairs, "in the line of duty," to the Secretary of the Interior recommending dismissal of an employee of the Indian Bureau pursuant to an order of the Secretary requiring a specific statement of reasons for dismissals. *Farr v. Valentine,* 38 App.D.C. 413, 420 (1912). "Had the defendant communicated these statements to one to whom he was under no obligation or duty to report, as the Commissioner of Pensions, a different case would be presented." *Id.* at 421. The court relied on its earlier decision in *DeArnaud v. Ainsworth,* 24 App.D.C. 167, 176 (1904), granting an absolute privilege to a War Department employee who allegedly had libeled an applicant for a medal of honor in a report reflecting "the exercise of his official duty" pursuant to department regulations. Clearly, therefore, the courts of this jurisdiction have recognized an absolute privilege for statements by subordinate public officials reporting to their superiors as required by particular regulations—a so-called privilege for mandatory duties.

Such a privilege might have been available to Maury. Appellants, however, failed to present this argument in the trial court, and, in any event, we cannot be sure from the record that the statements at issue here come within this absolute privilege. Accordingly, we cannot properly address appellants' second argument. *See Diavatis; Gray.* Appellants, therefore, are limited on appeal to their third argument, which they did advance at trial: the defense of official immunity (necessarily limited to acts other than those protected by the special rule for mandatory duties).[10]

Before turning to the issue of official immunity for District of Columbia officials, however, we want to make clear as background for analysis that the Supreme Court itself has recognized three categories of official duties or functions that have a bearing on the kind of privilege a government official can anticipate: (1) a "mandatory duty" or "duty required by law," *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959) (plurality opinion); *see Westfall v. Erwin,* 484 U.S. 292, 298, 108 S.Ct. 580, 584, 98 L.Ed.2d 619 (1988); (2) a "discretionary" act or function, *id.* at 298 & n. 4, 108 S.Ct. at 584 & n. 4; *Barr,* 360 U.S. at 575, 79 S.Ct. at 1341; and (3) a middle category of official conduct that is neither "mandatory" nor "discretionary," *i.e.,* conduct that "will often involve the exercise of a modicum of choice and yet be largely unaffected by the prospect of tort liability, making the provision of absolute immunity unnecessary and unwise." *Westfall,* 484 U.S. at 298, 108 S.Ct. at 584. As we shall elaborate below, this category of conduct is traditionally called "ministerial." As we shall also detail further, mandatory and discretionary duties commonly give rise to absolute immunity whereas ministerial duties at best evoke a qualified immunity.

Procedurally, moreover, we have a choice to make at this point in the analysis. We have noted that Maury was entitled to a qualified privilege as a representative of an employer investigating an employee's conduct. *See Thomas,* 168 A.2d at 910 (employer has qualified privilege to inquire into manner in which employees are conducting business affairs, but privilege may

---

**10.** Appellants argued at trial, in the alternative, for absolute immunity, relying primarily on *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (plurality opinion) and on *Expeditions Unlimited Aquatic Ents., Inc. v. Smithsonian Inst.,* 184 U.S.App.D.C. 397, 566 F.2d 289 (1977) (en banc), and for qualified immunity, relying mainly on *Smith v. District of Columbia,* 399 A.2d 213 (D.C.1979).

In their motion for judgment notwithstanding the verdict, appellants included in their argument for absolute privilege a citation to *Goggins v. Hoddes,* 265 A.2d 302, 303 (D.C.1970) (absolute privilege for report required by law to be

filed with unemployment compensation board). Appellants failed, however, to argue this particular theory of absolute privilege in connection with the motion for directed verdict or with the submission of proposed jury instructions. Nor, even in their post-verdict pleadings, did appellants identify *Goggins* as representing a "mandatory duty" subcategory of absolute privilege. Appellants' reference to *Goggins* in connection with the motion for judgment n.o.v., therefore, did not call appellees' and the trial court's attention to the "mandatory duty" theory of absolute privilege and, in any event, came too late for consideration of that theory on appeal.

be lost by "showing of excessive publication or express malice"); *supra* Part V. A. The jury was so instructed. This means that official immunity will help appellants only if it is absolute; qualified immunity would afford no more protection than the malice-destructible, qualified privilege available to any employer. Accordingly, we can either begin the inquiry (1) by assuming official immunity and asking whether, in the case of a government supervisor, it is absolute or qualified,[11] or (2) by asking whether, on these facts, there is immunity and then, if there is, by addressing the scope of immunity. Because the law is less clear on the scope of official immunity [12] than on the availability of immunity itself, we take the second approach.

In arguing at trial that Maury had been shielded by absolute official immunity, appellants relied heavily on *Barr, supra* note 10. *Barr* held that a federal official engaged in a discretionary act within the "outer perimeter of [the official's] line of duty" is absolutely immune from suit. *Id.* 360 U.S. at 575, 79 S.Ct. at 1341. The Court noted that absolute immunity is available for the exercise of a "mandatory duty," *i.e.*, an action required by law. *Id.*[13] The Court then reasoned that, although the defendant's action underlying the common law suit against him—an allegedly libelous press release—was not required by law or by the direction of his supervisor, the reasons for granting absolute immunity for the exercise of a mandatory duty applied with equal force to "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Id.* Appellants argue that Maury's statements evaluating Thompson and reporting her assault comprised the types of action that *Barr* would protect through absolute official immunity.[14]

Thompson counters with two arguments why *Barr* affords no absolute protection here. First, the immunity in *Barr* only

---

**11.** *Compare Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 157–58 (Alaska 1987) (governor entitled to qualified immunity for defamation claim) *and Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc.,* 31 N.J. 124, 141, 155 A.2d 536, 544–45 (1959) (immunity for administrative official's good faith exercise of discretion inapplicable where action was motivated by malice or bad faith) *with Adams v. Tatsch,* 68 N.M. 446, 451–55, 362 P.2d 984, 988–90 (1961) (highway commissioner absolutely immune from liability for allegedly malicious false charges against highway contractor).

**12.** *See Carter v. Carlson,* 144 U.S.App.D.C. 388, 391 n. 5, 447 F.2d 358, 361 n. 5 (1971) (not clear whether District of Columbia follows federal rule of absolute immunity for malicious acts by public officials within general scope of a discretionary function) (citing *Gager v. "Bob Seidel,"* 112 U.S.App.D.C. 135, 139–40, 300 F.2d 727, 731–32 (dictum), *cert. denied,* 370 U.S. 959, 82 S.Ct. 1612, 8 L.Ed.2d 825 (1962)).

**13.** *See, e.g., Goggins,* 265 A.2d at 303; *Farr v. Valentine,* 38 App.D.C. 413 (1912); *DeArnaud v. Ainsworth,* 24 App.D.C. 167 (1904).

**14.** It is unclear whether appellants, at the time of trial, understood *Barr* to afford absolute immunity only to "discretionary" actions or, as some courts at the time had interpreted *Barr,* to all conduct—including "ministerial" actions—that fall within the scope of official duties. *See, e.g., General Elec. Co. v. United States,* 813 F.2d 1273, 1276–77 (4th Cir.1987); *Poolman v. Nelson, 802 F.2d 304, 307 (8th Cir.1986). The Supreme Court recently made clear, however, in *Westfall v. Erwin,* 484 U.S. 292, 297–98, 298 n. 4, 108 S.Ct. 580, 584 n. 4, 98 L.Ed.2d 619 (1988), that "absolute immunity from state-law tort actions should be available only when the conduct of federal officials is within the scope of their official duties *and* the conduct is discretionary in nature.... *Barr* did not purport to depart from the widely followed common-law rule that only discretionary functions are immune from liability." (Emphasis in original.) *See also Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

Appellants also relied at trial, *supra* note 10, and on appeal on *Expeditions Unlimited,* in which the United States Court of Appeals sustained summary judgment for the defendants, based on absolute privilege, in a libel action based on a letter by a Smithsonian Institution official "critical of plaintiff's capabilities in the field of underwater archaeological excavation." 184 U.S.App.D.C. at 399, 566 F.2d at 291. Relying on *Barr,* the court "remanded for limited inquiry whether his letter was within the outer perimeter of his duties." 184 U.S.App.D.C. at 403, 566 F.2d at 295. The court used the phrases "within the ambit of his employment" and "within the ambit of his discretion" interchangeably, 184 U.S.App.D.C. at 399, 566 F.2d at 291, indicating, perhaps, an expansive reading of *Barr* at odds with the Supreme Court's later interpretation in *Westfall* clearly limiting absolute immunity to the outer perimeter of an official's *discretionary* authority.

governs activities within the scope of the official's authority, and, Thompson argues, Maury's statements were not "made in line with his legitimate supervisory functions." *See McKinney v. Whitfield*, 237 U.S.App. D.C. 157, 736 F.2d 766 (1984) (federal bureaucrats exceed outer perimeters of responsibilities and act manifestly beyond line of duty when they resort to physical force to compel obedience of managerial subordinates). This contention has no merit. As Thompson's supervisor, Maury was authorized, if not required, to evaluate Thompson's performance—in contrast with the lack of authority to commit an assault, as in *McKinney*. The mere allegation that Maury used this authority to commit a tort, defaming Thompson, does not deprive Maury of whatever immunity he may be entitled to receive. *See Barr*, 360 U.S. at 572, 79 S.Ct. at 1340 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)); *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 154–55 (Alaska 1987). If this were not true, official immunity would have no effect; any allegation that the official committed a tort would abrogate the immunity.

Second, Thompson suggests *Barr* is inapplicable because *Barr* involved a state law claim against a federal official, whereas Thompson presents state common law tort claims against, in legal effect, a state official. This distinction, without more, means nothing; but in any event, as we shall develop later, the rationale of *Barr*—as clarified more recently in *Westfall, supra* note 14—is consistent with the law of the District of Columbia, as we discern it, and may work to Thompson's advantage. We therefore turn to the issue of official immunity for District of Columbia officials.

A few early cases dismissed suits against District officials based on official immunity but without much explanation. The Municipal Court of Appeals of the District of Columbia, for example, held that the Collector of Taxes was not civilly liable for misinterpreting the statute authorizing tax collection, stating "the immunity which surrounds public officials in the performance of acts within the scope of their official duties is 'broad, deep and strong.' " *Goldstein v. Pearson*, 121 A.2d 260, 262 (D.C. Mun.App.1956) (quoting *Orvis v. Brickman*, 90 U.S.App.D.C. 266, 269, 196 F.2d 762, 765 (1952)). *See also Farrell v. Ward*, 53 A.2d 46, 50 (D.C.Mun.App.1947) (officials acting within scope of official duties not liable, in official capacity, for erroneous construction of law; liability, if any, is personal).

In 1971, in *Carter v. Carlson*, 144 U.S. App.D.C. 388, 391, 447 F.2d 358, 361 (1971), *rev'd on other grounds*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the United States Court of Appeals for the District of Columbia Circuit, in a case concerning the tort liability of a District police officer for assault and battery, as well as the liability of his supervisors for negligent training and supervision, held that while government officers are liable at common law for torts committed within the scope of their employment, in some circumstances they are protected by official immunity. The court distinguished "discretionary" functions, for which the officer is not liable, from "ministerial" acts, for which the officer is liable, stating that the difference between the two types of acts relates to the purposes of the respective functions. 144 U.S.App.D.C. at 392, 447 F.2d at 362. Immunity is granted to encourage " 'fearless, vigorous, and effective administration of policies of government.' " *Id.* (quoting *Barr*, 360 U.S. at 571, 79 S.Ct. at 1339). Accordingly, in determining whether a particular governmental function is discretionary, and thus falls within the scope of official immunity,

> it does not suffice to consider simply whether the officer has "discretion" in the sense that he [or she] exercises judgment in choosing among alternative courses of action. The proper approach is to consider the precise function at issue, and to *determine whether an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct.*

*Id.* (emphasis added). Although *Carter* is

not binding on this court,[15] the distinction drawn in *Carter* between discretionary and ministerial acts is consistent with later Supreme Court interpretation of the immunity established in *Barr*,[16] with state cases analyzing official immunity,[17] with the RESTATEMENT,[18] and with the approach taken by this court in *Wade v. District of Columbia*, 310 A.2d 857 (D.C.1973) (en banc), in delimiting the contours of municipal immunity.

*Wade* and *Carter* were the same case, brought in different courts, but the only issue presented on appeal in *Wade* was whether the District of Columbia was liable under respondeat superior for the intentional torts of its employees acting within the scope of their employment. *Id.* at 859. *Wade* held the District is immune from liability for the torts of its employees only if the suit arises from acts committed in the exercise of a discretionary function. *Id.* at 860. The District is liable if the act is committed in the exercise of a ministerial function. *Id.*

Later decisions of this court have developed this distinction. We have said, speaking generally, that discretionary functions concern "formulation" of policy, whereas ministerial functions concern "execution" of policy. *Rustin v. District of Columbia*, 491 A.2d 496, 500 (D.C.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985); *see Chandler v. District of Columbia*, 404 A.2d 964, 965–66 (D.C.1979). More specifically, we have said that this distinction turns on whether imposition of liability would more likely encourage or inhibit conscientious, effective performance of the particular governmental function at issue. *See Rustin*, 491 A.2d at 500; *Chandler*, 404 A.2d at 966. One way of testing this distinction is to ask whether, in evaluating particular governmental functions, there is any reason "to believe a jury could render a sounder decision than those officials chosen, qualified, and prepared to make them." *Id.*, *quoted in Rustin*, 491 A.2d at 500.

■ Although we have never squarely held (as the federal court of appeals did in *Carter*) that the issue of official immunity in a particular case turns on the discretionary-ministerial distinction, we believe that the line of cases beginning with *Wade*, and continuing through *Chandler* and *Rustin*, reflects a premise—which we adopt here as a sound judicial rule—that government employee immunity will depend on the same, discretionary-ministerial distinction that applies when determining immunity of the sovereign.[19] We perceive no sound basis for ruling, for example, that a government employee could be held liable for a discretionary act within the scope of the employee's authority but that the government employer would be immune from suit. Such a result would be fair neither to the employee nor to the plaintiff.

■ In taking this approach, we are adopting the rule, derived from *Barr*, applicable to federal officials charged with violations of state tort law. *See Westfall; supra* note 14. We see no reason why a

---

**15.** *See Wade v. District of Columbia*, 310 A.2d 857, 859 & n. 2 (D.C.1973) (en banc).

**16.** *See Westfall v. Erwin*, 484 U.S. at 297–98 & n. 4, 108 S.Ct. at 584 & n. 4; *supra* note 14.

**17.** *See, e.g., Aspen*, 739 P.2d at 155; *Chamberlain v. Mathis*, 151 Ariz. 551, 554–55, 729 P.2d 905, 909–10 (1986); *Trimble v. Denver*, 697 P.2d 716, 728–29 (Colo.1985) (en banc); *Ross v. Consumers Power Co.*, 420 Mich. 567, 631–37, 363 N.W.2d 641, 667–69 (1984); *Libercent v. Aldrich*, 149 Vt. 76, 81, 539 A.2d 981, 984 (1987); *Chambers–Castanes v. King County*, 100 Wash.2d 275, 281, 669 P.2d 451, 456 (1983) (en banc); *see also Tilton v. Dougherty*, 126 N.H. 294, 300, 493 A.2d 442, 446 (1985); *see generally* 63A AM.JUR.2D *Public Officers & Employees* §§ 362–63 (1984).

**18.** *See* RESTATEMENT (SECOND) OF TORTS § 895D(3)(a) (1979).

**19.** This rule also is consistent with the early cases granting immunity to District officials for the misinterpretation or misapplication of law. *Goldstein v. Pearson*, 121 A.2d 260, 262 (D.C. Mun.App.1956) (Tax Collector allegedly misinterpreted collection statute); *Farrell v. Ward*, 53 A.2d 46, 50 (D.C.Mun.App.1947) (Commissioners and Water Register allegedly construed law erroneously). *See also Chandler v. District of Columbia*, 404 A.2d 964, 966 (D.C.1979) (rejecting argument that employer-government should be liable for discretionary act even though employee-official is immune).

different rule should apply to District officials.

> The central purpose of official immunity, promoting effective government, would not be furthered by shielding an official from state-law tort liability without regard to whether the alleged tortious conduct is discretionary in nature. When an official's conduct is not the product of independent judgment, the threat of liability cannot detrimentally inhibit that conduct. It is only when officials exercise decisionmaking discretion that potential liability may shackle "the fearless, vigorous, and effective administration of policies of government." *Barr v. Matteo,* [360 U.S.] at 571 [79 S.Ct. at 1339].

*Id.* at 296–97.

█ We are aware that the discretionary-ministerial distinction can be elusive, for "virtually all official acts involve some modicum of choice." *Id.* at 298. Accordingly, absent legislative guidelines, we must select our own policy factors to determine whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to assure "fearless, vigorous, and effective" decision-making. *Barr,* 360 U.S. at 571, 79 S.Ct. at 1339. Persuaded by Professor Keeton's analysis, we believe the applicable policy factors should be "[1] the nature of the plaintiff's injury, [2] the availability of alternative remedies, [3] the ability of the courts to judge fault without unduly invading the executive's function, and [4] the importance of protecting particular kinds of official acts." PROSSER & KEETON § 132, at 1062. *See also* RESTATEMENT (SECOND) OF TORTS § 895D, comment f.

In applying these factors, a court must view the case from the victim's, as well as the public official's, perspective. Thus, in every case the court must weigh these competing interests, evaluating "whether the contribution to effective government" from official immunity would—or would not—outweigh the harm to the complainant. *Westfall,* 484 U.S. at 299, 108 S.Ct. at 585. It follows that, in order to apply the four factors in a particular case, the court

should know whether an official's immunity would be absolute or merely qualified (and thus malice-destructible) if the action were held to be discretionary; the respective burdens and benefits of official immunity to each party cannot be determined without knowledge of exactly what the immunity means. Obviously, the larger the scope of the immunity, the more significant the decision would be to conclude an action is discretionary. The very availability of official immunity in a particular context, therefore, is properly influenced by the scope of that immunity. *See id.* Accordingly, as it turns out, we must decide this latter issue—whether Maury's immunity would be absolute or qualified, if his reports evaluating Thompson were discretionary—before deciding, finally, whether Maury's actions should be characterized as discretionary or merely ministerial.

We have already noted that the states are divided over whether official immunity for alleged defamation, in the exercise of official discretion, is absolute or qualified, see *supra* note 11, and that the law of the District of Columbia is undecided, see *supra* note 12. We are satisfied, however, that the policies underlying official immunity expressed by the Supreme Court in *Barr* and *Westfall,* and repeated not only in *Carter* but also in this court's decisions in *Chandler* and *Rustin,* dictate a clear outcome: official immunity—if available at all—must be absolute. If official action is indeed discretionary, failure to afford absolute immunity would unduly inhibit the government official in the performance of "fearless, vigorous, and effective administration of policies of government." *Barr,* 360 U.S. at 571, 79 S.Ct. at 1339.

We therefore turn to Maury's actions: discretionary or ministerial? Looking at applicable policy factors, see *supra* page 297, we initially acknowledge two that arguably cut against Maury's liability: (1) Thompson's injuries from the alleged defamation are economic, not physical, and (2) Thompson did have some alternative, administrative remedies through the OEA and the PERB (*supra* Part III). *See* PROSSER & KEETON § 132, at 1062–64. On the

other hand, it is unclear that Thompson's alternative remedies could provide effective redress for economic losses attributable to the alleged defamation. Furthermore, as to the third factor, it is far from clear on this record whether potential liability for defamatory employee evaluations would unduly invade the Library's or its employee-supervisor's ability to function. *See id.* at 1065–66. We cannot tell, for example, whether employee evaluation is based on prescribed criteria and is typically routine or in some respects reflects policy choices. Thus, we cannot tell whether the jury, in holding a government supervisor accountable for a defamatory evaluation, would—or would not—be unduly interfering with a prerogative of the executive. *See id.* at 1065. For the same reasons, *see id.* at 1065–66, we cannot tell from this record, as to the fourth factor, how important it is to protect this particular kind of official act—an employee evaluation—from the scrutiny of a defamation action. In short, absent further trial court findings as to the applicable policy factors, we cannot say as a matter of law whether defendants-appellants have, or have not, carried their burden of sustaining absolute immunity.[20] Accordingly, we reverse and remand the defamation count.

We emphasize again, however, that, to the extent a government supervisor's evaluations of an employee are required by law, they are absolutely privileged without regard to the discretionary-ministerial analysis. *See, e.g., Goggins,* 265 A.2d at 303; *supra* note 13 and accompanying text. Had Maury properly raised that defense in the trial court, he might well have benefitted from it. We do not foreclose him from raising that defense on remand. Because the trial court, in applying the policy factors discussed above, will necessarily have to uncover evidence about the nature and requirements of employee evaluations in the library system, it would be inappropriate under the circumstances not to permit Maury to apply all available

theories to that evidence in his defense. This is especially true because a "mandatory duty" inquiry is surely inherent in the trial court's consideration of the applicable policy factors.

In sum, because we cannot discern whether the trial court erred in denying a directed verdict, we reverse and remand for further findings as to the privilege and for a trial court ruling, once again, on that issue.

## VI.

Appellants contend, with respect to Thompson's claims for assault and battery and for defamation, that the trial court erroneously excluded relevant character evidence. They say that two types of proffered evidence were excluded: (1) evidence of Thompson's prior threats and assaults against co-workers, as well as her post-termination assault of a former Northeast co-worker; and (2) evidence of Maury's peaceful character.

The trial court, in response to Thompson's motion, issued an order in limine, instructing defense counsel to

> refrain from asking about, commenting about, referring to or eliciting testimony from any witness relating to or regarding any purported episodes of assaultive conduct engaged in or perpetrated by the Plaintiff Patricia Joan Thompson, except for the assaultive conduct that is the subject of this action.

Because of this ruling, defense counsel was prevented from presenting testimony about Thompson's assaults of co-workers that resulted in her transfer to the Northeast branch and of a post-termination fight with a former coworker. In addition, the trial court limited testimony about Thompson's threats to harm Neal and about the names Thompson called Neal. Nor did the court allow evidence of Maury's peaceful character.

**20.** Because the allegedly libelous letter in *Expeditions Unlimited* was a communication by a higher official to an outside party and because, in any event, it is unclear how the federal court

was interpreting *Barr,* see *supra* note 14, we believe the reasoning of *Expeditions Unlimited,* on which appellants rely, is not conclusive here.

In *Phillips v. Mooney*, 126 A.2d 305, 308 (D.C.Mun.App.1956), we held that, as a general rule in civil assault and battery cases, neither party's character "is an issue and cannot be the subject of attack, unless it is first attacked or supported by the adversary, or placed in issue by the nature of the proceeding itself." In *Phillips*, the plaintiff claimed to be the victim of an unprovoked attack while the defendant pleaded self-defense. Each party claimed damages from the other. We held that "the nature of the proceeding," a claim of self-defense, put both parties' "character for peace and quiet in issue." *Id.* Although *Phillips* involved a self-defense claim, the court suggested character for peace and quiet is at issue generally whenever "the main issue [is] who was the aggressor." *Id.* Similarly, in *Johns v. United States*, 434 A.2d 463, 469 (D.C.1981), a criminal assault case, we explained that evidence about the assault victim's violent character is relevant to a self-defense claim not only to show whether the defendant was in reasonable fear of imminent great bodily injury but also to answer "the objective question who was the aggressor."

The instant case does not include an issue of self-defense, and thus *Phillips* and *Johns* do not squarely decide the evidentiary issue presented. But these cases do, nonetheless, support appellants' argument that evidence of Thompson's and Maury's character for peace and quiet is relevant to determining who was the aggressor. Moreover, courts of other jurisdictions allow evidence of the parties' character for peace and quiet in cases of mutual allegations of assault, as in the present case. *See Feliciano v. Honolulu*, 62 Haw. 88, 92, 611 P.2d 989, 992 (1980); *Carrick v. McFadden*, 216 Kan. 683, 533 P.2d 1249 (1975); *J.C. Penney Co. v. Gravelle*, 62 Nev. 434, 446, 155 P.2d 477, 480 (1945); *Strickland v. Jackson*, 23 N.C.App. 603, 606–08, 209 S.E.2d 859, 862–63 (1974); *Bell v. Philadelphia*, 341 Pa.Super. 534, 544, 491 A.2d 1386, 1391 (1985); *see also* Anno-

tation, *Admissibility of Evidence of Character or Reputation of Party in Civil Action for Assault on Issues Other Than Impeachment*, 91 A.L.R.3d 718, § 16 (1979).[21] As in criminal cases, this evidence is admitted to show that each party acted in conformity with his or her character and is justified by the rationale that there is a "special need beyond that in most cases of charges of crime in civil actions to know the dispositions of the parties...." CLEARY, MCCORMICK ON EVIDENCE 571 n. 5 (1984); *see Pino v. Koelber*, 389 So.2d 1191, 1193 (Fla.Dist.Ct.App.1980); *Niemeyer v. McCarty*, 221 Ind. 688, 694, 51 N.E.2d 365, 368 (1943); *Strickland*, 23 N.C.App. at 606, 209 S.E.2d at 862; *Bell*, 341 Pa.Super. at 545, 491 A.2d at 1391.

■ This rationale is consistent with our ruling in *Phillips* that evidence of the parties' character was relevant to determine who was the aggressor. 126 A.2d at 308. *Phillips*, unlike *Johns* (the criminal case), allowed evidence about the character of both parties once character was at issue. *Phillips*, 126 A.2d at 308. In line with precedent from other jurisdictions, we extend the rule established in *Phillips* to allow evidence of the peaceful or violent character of the parties in civil assault cases in which mutual assault is alleged, in order to help prove who was the aggressor.

■ In the present case, both as to Thompson's claim of assault and battery and as to Maury's counterclaim of assault and battery, neither party claimed self-defense. But, both parties claimed the other party initiated the assault. Thus, the issue at trial was, "Who was the aggressor?" The trial court erred by not admitting evidence of Thompson's threats and assaults of her coworkers and, further, by not admitting evidence of Maury's peaceful character. Since the evidence at trial of Thompson's and Maury's alleged assaults of each other consisted mainly of the testimony of Maury and Thompson, making the issue essentially one of credibility, the er-

---

**21.** Other cases, while dealing with character evidence in the context of a self-defense claim to a criminal prosecution, state the rule more broadly so as to include allegations of mutual assault.

*See, e.g., Pino v. Koelber*, 389 So.2d 1191, 1193 (Fla.Dist.Ct.App.1980); *Niemeyer v. McCarty*, 221 Ind. 688, 51 N.E.2d 365, 370 (1943).

ror was not harmless. It warrants reversal and remand for a new trial on the assault claims. *See Montgomery v. Dennis,* 411 A.2d 61 (D.C.1980) (reversing and remanding where evidence corroborating appellant's testimony that he had been assaulted was excluded).

■ In addition, Thompson's defamation claims are premised, at least in part,[22] on Maury's allegedly false accusation that Thompson assaulted him. At trial, Maury testified that he did not assault Thompson, that she in fact assaulted him, and, therefore, that he did not lie about the incident when he reported it to his superiors. Since truth is an absolute defense to defamation claims, *see Ford Motor Credit Co. v. Holland,* 367 A.2d 1311, 1313 n. 1 (D.C.1977), the jury could not rationally find for Thompson on her defamation claim if the jury believed Maury's version of the incident. Because the evidence of Thompson's threats and assaults of her co-workers is admissible to prove that she initiated the assault, this evidence is relevant to the defense of truth. Accordingly, because the defense of truth turned on the jury's assessment of the credibility of Maury and Thompson, we must also reverse with respect to the defamation count and remand for a new trial. In the event that Maury is entitled to an absolute privilege, however, see *supra* Part V.B., the defamation count must be dismissed.

### VII.

Finally, appellants contend they are entitled to a new trial because the trial judge, over objection, improperly injected himself into the proceedings and deprived them of their right to a fair trial guaranteed by the due process clause of the fifth amendment. Because we reverse and remand for other grounds, we address this contention only for purposes of evaluating whether the case should be remanded to the same or a different judge.

The trial judge may "make proper inquiry of any witness when he [or she] deems that the end of justice may be served thereby and for the purpose of making the case clear to the jurors." *Griffin v. United States,* 83 U.S.App.D.C. 20, 21, 164 F.2d 903, 904 (1947), *cert. denied,* 333 U.S. 857, 68 S.Ct. 727, 92 L.Ed. 1137 (1948). The judge, however, must remain a "disinterested and objective participant in the proceedings." *Billeci v. United States,* 87 U.S.App.D.C. 274, 283, 184 F.2d 394, 403 (1950). The right to a fair trial "may be imperiled by an apparent breach of the atmosphere of judicial evenhandedness that should pervade the courtroom." *United States v. Barbour,* 137 U.S.App.D.C. 116, 118, 420 F.2d 1319, 1321 (1969). This line can be crossed by too extensive questioning by the trial court or by the trial judge's alignment with one of the parties. *Haughton v. Byers,* 398 A.2d 18, 21 (D.C.1979).

After a thorough review of the transcript of the trial, we are satisfied that the cumulative impact of the trial court's questions and comments may have swayed the jury to favor Thompson. *See, e.g.,* trial transcript at 164, 281, 326, 384, 400, 1270–71, 1273, 1277, 1412–13, 1449, 1539–46, 1549, 1624, 1698–1700. Accordingly, on remand the case should be assigned to a different judge.

### VIII.

In sum, we reverse on all counts. We remand to the trial court the count for intentional infliction of emotional distress with an order to vacate the judgment against both the District of Columbia and Maury and to dismiss this claim. We also remand the remaining claims against the District of Columbia—defamation and as-

---

**22.** In her brief on appeal, Thompson argues that her defamation claim "arises exclusively from false statements made by Alfred Maury wherein he claimed that Patricia Thompson had assaulted him." At trial, however, Thompson's claims of defamation were far broader. We need not decide how limited Thompson's defamation claims were because the jury's finding of defamation did not differentiate between allegedly false accusations of assault and battery and other allegedly false statements. Therefore, if part of the verdict must be reversed and remanded, the entire verdict must be reversed and remanded. *See District of Columbia v. White,* 442 A.2d 159, 165 (D.C.1982) (erroneous submission of theory of negligence to jury undermines jury verdict where jury did not specify theory underlying its finding).

sault and battery—with directions to stay all further proceedings until Thompson has had a reasonable time to file for disability benefits under CMPA for her claimed injuries. If DOES concludes that Thompson's claims fall within CMPA, the trial court shall dismiss Thompson's claims against the District. But see *supra* note 6. If DOES decides the claims do not fall within CMPA, the trial court shall order a new trial as to the District. We remand the remaining claims against Maury—defamation and assault and battery—for further proceedings.[23]

*Reversed and remanded.*

---

**23.** Appellants present two additional claims of error. First, appellants argue the trial court excluded evidence of an alternative source of Thompson's emotional distress, the break-up with her boyfriend. Since we dismiss the claim for intentional infliction of emotional distress on other grounds, we need not reach this argument. Second, appellants argue they are entitled to a new trial because the trial court improperly instructed the jury. It appears the trial court did erroneously instruct the jury in such a way that it could have awarded double damages: The court instructed that if the jury found for Thompson on any tort count, she could be compensated for any past and future "loss of earnings" and, in addition, if it found Thompson had been defamed, the jury could award damages for "such sums" as would compensate her for injuries to her "occupation as a library technician." Because we order a new trial, we need not decide whether this error would entitle appellants to a new trial on damages.